**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FEDERADDIS BAYYE, | |
| Plaintiff, | |
| v. | Civil Action No. 19-19488 (EP) (ESK) |
| BERGEN NEW BRIDGE MEDICAL CENTER and JOHN DOE/JANE DOES A THROUGH D, | **OPINION** |
| Defendants. | |

**PADIN**, **District Judge.**

Plaintiff Federaddis Bayye, who identifies as Black and Ethiopian, worked for Defendant Bergen New Bridge Medical Center (the "Hospital") as a Mental Health Assistant ("MHA"). In 2012, Plaintiff broke her right wrist on the job. Plaintiff thereafter worked under a "light duty" restriction, which limited how much weight she could lift. For a few months in 2018, Plaintiff returned to full duty. Later in 2018, the Hospital determined that Plaintiff could not perform her MHA job functions and fired her.

Plaintiff sued, alleging disability discrimination under the Americans with Disabilities Act ("ADA") and the New Jersey Law Against Discrimination ("NJLAD"), as well as Title VII and NJLAD race and national origin discrimination. The Hospital now seeks summary judgment dismissing the entire Complaint, which Plaintiff opposes. D.E.s 37, 44. For the reasons below, the Court will **DENY in part** and **GRANT part** the Hospital's motion. Specifically, the Court will dismiss the race and national origin discrimination claims, but not the disability claims.

I.     **BACKGROUND**[1]

A.  **Plaintiff's duties at the Hospital**

The Hospital employed Plaintiff as an MHA in the Hospital's Behavioral Health Services Division.  Facts ¶ 1.  Plaintiff was a member of the American Federation of State, County and Municipal Employees ("AFSCME") union.  *Id.*

Plaintiff's MHA functions included assisting patients with the activities of daily living (bathing, dressing, ambulating, feeding, and showering) and lifting, positioning, pushing, and/or transferring patients.  *Id.* ¶ 2; Pl. Dep. 91:11-16; D.E. 37-4 at 9.  Plaintiff also assisted with patient de-escalation, sometimes referred to as "Team 20" (crisis situation) or "Dr. Strong" (subduing a patient) codes.  Facts ¶¶ 2-4.

B.  **Plaintiff's wrist injury**

On January 15, 2012, Plaintiff injured her right wrist on the job.  Facts ¶ 7.  When Plaintiff returned to work, she was placed on a light duty restriction.  *Id.*  She remained on light duty restriction until January 2018.  *Id.*

In January 2018, the Hospital's human resources department ("HR") evaluated the status of all employees on long-term restrictions, including Plaintiff.  *Id.* ¶ 8.  On January 29, 2018, a

---

[1] These facts are from the Hospital's Rule 56.1 Statement of Undisputed Material Facts ("Facts"). D.E. 37-2.  Plaintiff did not, as this Court's rules require, "furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." Loc.R.Civ.P. 56.1(a).  Plaintiff is advised to follow the appropriate procedure in the future.

The Court also relies upon the following documents:
- "Park Decl." – Declaration of Roy Park, Hospital's Senior VP of Human Resources. D.E. 37-4
- "Pl. Br." – Plaintiff's opposition brief.  D.E. 44
- "Hospital Mot." – Hospital's moving brief.  D.E. 37-1
- "Pl. Dep." – Transcript of Plaintiff's deposition.  D.E. 37-3

meeting was held between Plaintiff and HR representatives.[2]  *Id.* ¶ 9.  During this meeting, the participants reviewed Plaintiff's medical records and concluded that she had reached: maximum medical improvement."  *Id.* ¶ 10.  Plaintiff agreed that she could return to work without restrictions. *Id.* ¶ 11.

### C.  Plaintiff's doctor recommends a permanent work restriction

From January 2018 to March 2018, Plaintiff worked without restriction.  *Id.* ¶ 12.  Toward the end of that period, the Hospital received a March 19, 2018 script authored by Plaintiff's treating doctor, Dr. McBride.  *Id.* ¶ 14.  The script imposed work guidelines of modified/light duty with "Permanent restriction: no lifting over 20 lbs."  *Id.*

 On April 5, 2018, another meeting to review Plaintiff's work restrictions was held.  *Id.* ¶ 13.  This meeting included Plaintiff, her supervisor, her union representative, and HR representatives.  *Id.*  The participants reviewed Dr. McBride's note and Plaintiff's job description to determine whether Plaintiff could perform essential MHA functions with or without a reasonable accommodation.  *Id.* ¶ 15.  Having determined that the permanent restriction prevented Plaintiff from performing essential MHA functions, the Hospital suspended Plaintiff, but agreed to maintain her as an "active employee" as the parties determined whether Plaintiff might qualify for other positions at the Hospital.  *Id.* ¶ 16; Pl. Dep. 124:10-12

Plaintiff acknowledged that even after she was placed on leave from her MHA position, she knew she remained a Hospital employee.  Pl. Dep. 124:10-12.  The Hospital told Plaintiff they were going to try to find her other work.  *Id.* 124:13-20.

---

[2] Also in attendance telephonically was "D&H Alternative Risk Solutions" employee Lucia Winter.  Facts ¶ 8.  This individual's role is unclear.

### D.  The Hospital attempts to find a reasonable accommodation

On April 11, 2018, Plaintiff met with her union representative and Hospital Employment Manager Lauren Scutari.  *Id.*  ¶ 18.  Plaintiff applied for a position as a Document Imaging Specialist in the Hospital's record room, but never received an interview.  *Id.*; Pl. Dep. 128:1-6. According to the Hospital, this is because the record room position required clerical and computer experience which Plaintiff admittedly lacked.  *Id.* ¶¶ 19-20; Pl. Dep. 128:7-12 (acknowledging "not really, not much" experience working with computers).

The Hospital afforded Plaintiff a chance to apply for other positions which could accommodate her 20-pound lifting restriction.  Plaintiff declined one such position, in the Hospital's kitchen, because the job was "not easy for [her] hand."  *Id.* 124:16-20.  Likewise, Plaintiff declined to apply for a bus driver position.  Facts ¶ 23; Pl. Dep. 126:16-127:1.  Plaintiff did not believe she was qualified for anything else on the Hospital's career website.  Facts ¶ 23; Pl. Dep. 177:2-178:2, 130:13-17.

In a June 15, 2018 email to Plaintiff's attorney, the Hospital's attorney indicated that Plaintiff had applied only for the record room position for which she did not qualify.  D.E. 37-4 at 23.  That email advised Plaintiff to contact the Hospital's employment manager and Plaintiff's union representative to determine if there was another position Plaintiff was interested in that she was qualified to perform.  *Id.*

### E.  The contradictory doctor's note prompts the Hospital's Functional Capacity Evaluation

The Hospital scheduled a June 22, 2018 meeting to review additional jobs that could accommodate Plaintiff's restrictions, including Diet Clerk, Cashier, and Try Line positions in the Food and Nutrition Department.  Facts ¶ 26; D.E. 37-4 at 25.  At the meeting, Plaintiff presented a second note from Dr. McBride.  Facts ¶ 27.  The note, dated June 18, 2018, "cleared [Plaintiff]

to work full duty" with "no restrictions" as of that date.  *Id.*; D.E. 37-4 at 29.  This contradicted Dr. McBride's first note imposing a permanent restriction on Plaintiff lifting more than twenty pounds.[3]  Facts ¶ 28.

The second note does not indicate whether Dr. McBride examined Plaintiff after imposing the permanent restriction, or otherwise indicate the basis for the change.  Plaintiff testified that she saw Dr. McBride in person on June 18, 2018 and asked him to clear her to return to work.[4]  Facts ¶ 29; Pl. Dep. 74-76.  Because of the conflict between Dr. McBride's first and second notes, the Hospital asked Plaintiff to undergo a Functional Capacity Evaluation ("Evaluation"), an independent examination to evaluate one's capacity to perform work activities.  Facts ¶ 32.

The Hospital performed the Evaluation on June 28, 2018 and received the results on July 3, 2018.  Facts ¶ 34; D.E. 37-4 at 33, *et seq.*  As relevant here, the Evaluated concluded that Plaintiff could perform "Light" work ("occasional lift and work up to 20 lbs.") with certain precautions related to right upper extremity activities.  D.E. 37-4 at 45.

### F.  The Hospital fires Plaintiff

The Hospital interpreted the Evaluation to conclude that Plaintiff could not meet the MHA position's physical requirements.  Facts ¶ 37.  The Hospital also determined that Plaintiff was not qualified for, or interested in, any other available position.  Facts ¶ 39.  Accordingly, the Hospital fired Plaintiff by letter date August 7, 2018.  Facts ¶ 40; D.E. 37-4 at 48.

---

[3] Plaintiff has also submitted a May 2, 2018 from a Dr. Sidney Rabinowitz, M.D., P.A., which indicates that she "may return to work without restrictions."  D.E. 44-4 at 1.  It is unclear whether this letter was ever provided to the Hospital.  The document also fails to note when (or if) Dr. Rabinowitz ever examined Plaintiff.  But even if it were excluded, that would still leave one note (Dr. McBride's) clearing Plaintiff for a full return to work without restrictions.

[4] The Hospital argues that this is contradicted by Plaintiff's "account financial history" from Dr. McBride's office, which lists no visits by Plaintiff after March 19, 2018.  D.E. 37-3 at 40.

This action followed, alleging three counts.  D.E. 1 ("Compl.").  First, Plaintiff alleges race discrimination in violation of Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination.   Compl. ¶¶ 23-26.   Second, Plaintiff alleges disability discrimination under the Americans with Disabilities Act and the NJLAD.   And third, Plaintiff alleges national origin discrimination in violation of the NJLAD.

The Hospital now moves for summary judgment.  D.E. 37.  Plaintiff opposes.  D.E. 44. The Hospital did not reply.

## II.    LEGAL STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A disputed fact is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.*

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (cleaned up).  "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment."  *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex Corp.*, 477 U.S. at 322.  "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 250-51.

## III.  DISCUSSION

### A.  Plaintiff's disability claims (Count Two) will not be dismissed

The ADA prohibits employers from discriminating against qualified individuals with a disability.  42 U.S.C.A. § 12112(a).  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In the absence of direct evidence of discrimination, which rarely exists, ADA claims follow the *McDonnell Douglas* burden-shifting paradigm to prove discrimination through indirect evidence.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *McNemar v. Disney Store, Inc.,* 91 F.3d 610, 619 (3d Cir. 1996), *abrogated on other grounds by Cleveland v. Policy*

7

*Management Sys. Corp.,* 526 U.S. 795 (1999).  First, a plaintiff establishes *prima facie* discrimination case by showing that s/he: "(1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an otherwise adverse employment decision as a result of discrimination."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

New Jersey courts utilize a similar framework to analyze disparate treatment claims under the NJLAD.  *Davis v. Lowe's Home Centers, Inc.*, No. CIV. 13-345, 2014 WL 7269638, at *5 (D.N.J. Dec. 17, 2014) (citing *McDonnell Douglas,* 411 U.S. 792, and *Gerety v. Atl. City Hilton Casino Resort,* 184 N.J. 391, 399 (2005)).

To prove *prima facie* NJLAD discrimination, a plaintiff must demonstrate that she:

(1) is disabled or is perceived to have a disability;
(2) was qualified for the position;
(3) was subjected to an adverse employment action; and
(4) the employer sought to, or did fill the position with a similarly-qualified person.

*Victor v. State,* 203 N.J. 383, 409-10 (2010); *Gerety,* 184 N.J. at 399.

Under both the ADA and NJLAD, if the plaintiff meets the *prima facie* burden, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Sever v. Henderson,* 220 Fed. App'x 159, 161 (3d Cir. 2007) (*citing Salley v. Circuit City Stores, Inc.,* 160 F.3d 977, 981 (3d Cir. 1998)) (citation omitted). To survive summary judgment, the plaintiff must then produce evidence from which a fact finder could reasonably either disbelieve the employer's articulated legitimate reasons or believe that a discriminatory reason was more likely than not a cause of the employer's action.  *Id.*

Back to the first *McDonnell Douglas* step: Plaintiff's *prima facie* burden.  Though the parties dispute the extent and significance of Plaintiff's wrist injury, they do not dispute the first factor, that the injury constituted a "disability" within the meaning of the ADA.  *See* 42 U.S.C. §

12102(2) (requiring "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) "a record of such an impairment;" or (3) being "regarded as having such an impairment"). Nor do the parties dispute the third factor, that Plaintiff's termination constituted an adverse employment action.

The parties focus on the second factor. Plaintiff argues that she was qualified to perform (and was performing) her essential job functions with or without accommodations. Pl. Opp'n. 7. The Hospital disagrees, and highlights Plaintiff's rejection of the Hospital's efforts to offer a reasonable accommodation by offering a different, permanent light duty position. Hospital Mot. 9.

Thus, the central question is whether there is any genuine issue of material fact as to whether Plaintiff could perform the essential functions of her MHA job. This can be further divided into two sub-questions: what the MHA's essential job functions are, and whether Plaintiff could perform them. If there is a genuine issue of material fact as to either, summary judgment must be denied.

### 1. The essential functions of the MHA job are unclear

Although the *prima facie* burden is on the plaintiff to show that he is a qualified individual, the employer "has the burden of showing a particular job function is an essential function of the job." *Supinski.*, 413 F. App'x at 540 (quoting *Rehrs v. Iams Co.,* 486 F.3d 353, 356 (8th Cir. 2007) and *Ward v. Mass. Health Research Inst., Inc.,* 209 F.3d 29, 35 (1st Cir. 2000)); *see also* 29 C.F.R. § 1630, app. § 1630.2(n) (while "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards," the employer "will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper").

"[W]hether a particular function is essential 'is a factual determination that must be made on a case by case basis [based upon] *all* relevant evidence.'" *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998) (quoting 29 C.F.R. § Pt. 1630, App. § 1630.2(n)).   The "essential functions" of a position are the "fundamental job duties," not "marginal functions."   29 C.F.R. § 1630.2(n)(1).   "A job function may be considered essential for a number of reasons, including because[:] (1) 'the reason the position exists is to perform that function,' (2) only a limited number of employees are available 'among whom the performance of that job function can be distributed,' or (3) the function is 'highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.'" *Supinski v. United Parcel Serv., Inc.*, 413 F. App'x 536, 540 (3d Cir. 2011) (quoting 29 C.F.R. § 1630.2(n)(1)).

Under the ADA's implementing regulations, evidence that a particular job function is essential may include, but is not limited to:

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

*Id.* at 540 (citing 29 C.F.R. § 1630.2(n)(3)).

Accordingly, in this context, summary judgment for the Hospital is appropriate only if "reasonable jurors could not but find that heavy lifting exceeding Plaintiff's restrictions was an essential function" of her MHA job. *Supinski*, 413 F. at 540.  And when there is a question of fact regarding an element in the *prima facie* case, the Court need not address the burden shifting framework until the factual dispute is resolved.  *Miller v. Cnty. of Lebanon Transit Auth.*, No.

1:17-CV-1368, 2019 WL 1453077, at *4-5 (M.D. Pa. Apr. 2, 2019) (citing *Supinski*, 413 F. at 536).

Here, the summary judgment record is, at best, ambiguous regarding the extent of the MHA position's lifting requirements.  Plaintiff focuses on the MHA job requiring "only…20 pounds of frequent lifting."   D.E. 44 ("Pl. Br.") 13.   The Hospital, however, focuses on the DOT's classification of the MHA job as a "medium" category job requiring occasional lifting of 50 pounds, incompatible with a permanent light duty maximum of 20 pounds.  Park Decl. ¶ 16.

But notably, neither the Hospital in its brief, nor the independent Evaluation relied upon to determine that Plaintiff could not perform the MHA job, referenced the Hospital's own MHA job description.  D.E. 37-4 at 9-11.  And perhaps for good reason: that description lists several duties involving physical activity—for example, "helps patient ambulate" or "[l]ifts, positions, pushes, and/or transfers patients"—without specifying any weight or frequency.  *Id.*  That absence is made more conspicuous because frequency *is* mentioned elsewhere in the job requirements.  *Id.* 10 (listing "frequent prolonged standing/walking" as a "job setting/physical demand").  There is also nothing in the record otherwise indicating the usual weight Plaintiff might have to lift.  *Cf Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 630-31 (7th Cir. 2020) (record was undisputed that average package was 15 pounds, meaning that the employee's "medical restrictions precluded her from lifting a substantial portion of packages above her waist or shoulders.").

Indeed, even a job description posted by the Hospital *after* firing Plaintiff used similar, general language without specifying any weight or frequency.  D.E. 37-4 at 12-13.  And where certain physical duties were added—for example, "Team 20/Dr. Strong" involvement—the listing explicitly notes that the MHA would *assist*, not perform those duties solo.  *See, e.g.*, D.E. 37-4 at 12 ("Assists in patient management…and physically assists in patient containment, restraint or

11

seclusion under the direction of the Registered Nurse.").  Given these ambiguities, the Hospital has not demonstrated that lifting a certain weight is an "essential function" of the MHA job.  *See Supinski*, 413 F. App'x at 541 (reversing grant of summary judgment where loader/unloader job description refers to lifting of packages "to heights above the shoulder" without specifying those packages' weight); *see also Davis*, 2014 WL 7269638, at *8 (denying summary judgment because plaintiff could lift some items, and the extent of lifting that was "essential" to plaintiff's job was a question of fact for a jury); *Grande v. Saint Clare's Health Sys.*, 230 N.J. 1, 27-28 (2017) (summary judgment denied where there was a dispute as to whether an independent report identifying a hospital's job requirements, including lifting weight and frequency, were actually the standards applicable to the employee's position).

Moreover, a fact finder can reasonably infer that a job function is not "essential," for ADA purposes, if an employee who supposedly cannot perform the function nevertheless succeeds at the job for an extended period.  *Brown v. Smith*, 827 F.3d 609 (7th Cir. 2016) (four years); *Shell v. Smith*, 789 F.3d 715 (7th Cir. 2015) (12 years); *Miller v. Illinois Dept. of Transp.*, 643 F.3d 190 (7th Cir. 2011) (employee performed the duties of his street-supervisor position for four years without ever needing to drive a bus); *Jankowski v. Dean Foods Company*, 378 F. Supp. 3d 697 (N.D. Ill. 2019) (plaintiff performed for over one year the essential functions of his job within medical restrictions "through various methods and techniques, including reducing the weight of the cases that he has to lift, and that he could do so without help or decreasing productivity"); *Crain v. Roseville Rehabilitation and Health Care*, 2017 WL 1075070 (C.D. Ill. 2017) (employer offered nothing to rebut employee's testimony that she was able to meet job expectations as a transport aide or certified nursing assistant for five years despite permanent lifting restrictions). *Cf.* Dyke v. O'Neal Steel, Inc., 327 F.3d 628 (7th Cir. 2003) (Plaintiff, who had one eye, was fired

12

from a metal factory job after two weeks because he could not satisfy "reasonable and appropriate" physical and vision requirements for binocular vision and two-week safety record was not enough to show prolonged safe performance).

Here, the record supports Plaintiff's arguments that she had been performing her MHA functions without issue between her return to work after her wrist injury in 2012 with a "light duty" restriction and January 2018, when she was returned to full duty for three months.  Pl. Opp'n. 13. There is no support in this record, or even an allegation, that Plaintiff posed a safety hazard to any patients because of any lifting restrictions.  Accordingly, because the record is unclear as to what the MHA job functions were, summary judgment is inappropriate.

### 2.  There is an issue of fact as to whether Plaintiff could perform the MHA job's essential functions

Courts cannot determine an employee's ability to do a job if it is not clear what the job entails.  And here, ambiguity about the MHA job's essential functions precludes summary judgment to the Hospital on its argument that Plaintiff was not "qualified" under the ADA and NJLAD to perform those essential functions.  *Supinski*, 413 F. App'x at 542-43 ("Because we conclude there is a genuine factual issue as to whether such heavy lifting was an essential job function…, we must also hold the District Court erred in concluding, as a matter of law, that UPS had 'no duty to change the requirements…to accommodate [the employee's] physical capacity.").  But even if the MHA duties were clear—and defined exactly as the Hospital says—there would also be an issue of fact as to whether Plaintiff could perform those duties.

The Hospital argues that Plaintiff's Evaluation "objectively determined that [she] did not meet the physical requirements of her MHA job."  Park Decl. ¶¶ 16-17.  But the Evaluation only determined that Plaintiff did not meet the requirements of the *DOT*'s MHA description, which defines the MHA position as a "medium" category job requiring frequent lifting of 20 pounds and

13

occasional lifting of 50 pounds.  D.E. 37-4 at 34.  The Evaluation hedges its determinations, stating that "the Employer's job description may not specify or may specify a lower/higher work strength capacity requirement than the DOT.  If the [Evaluation] is negative or mild regarding residual movement and/or asymmetrical strength deficit, it is within a reasonable degree or probability to assume the Examinee can safely return to work."  Park Decl. ¶ 16.

The Evaluation also deferred to Plaintiff's doctor to make the final return-to-work determination.  D.E. 37-4 at 45 ("The [Evaluation] is for information purposes only and is intended to be used as a guideline for back to work decision making by the attending physician, who has medical authority for the final decision on work status.").  *See Grande*, 230 N.J. at 28-29 (denying summary judgment where the independent report "makes clear that 'determination for final return to work abilities ... is deferred to [the employee's] treating physician'").

Here, two separate doctors determined that Plaintiff could return to duty without restrictions.  The Hospital challenges the reliability of Dr. McBride's second note clearing Plaintiff, arguing that "Dr. McBride's office records reflect no visits or treatment after March 19, 2018," the date that Dr. McBride's first note imposed a permanent light duty restriction.  Hospital Mot. 6.  But that argument addresses the weight that should be afforded to Dr. McBride's opinion, a determination not appropriate for summary judgment.  As for the second note, attached to Plaintiff's opposition (D.E. 44-4), the Hospital's failure to reply takes on added significance because a reply could have addressed that note.

There is likewise another indication that Plaintiff could perform her MHA duties: she had already been performing them for years.  Courts have denied summary judgment where an employee whose essential duties included lifting could actually perform those duties despite medical restrictions.  *See, e.g., Jankowski*, 378 F. Supp. at 697 (genuine issues of material facts

14

found where employee in "Empty Case Room" testified that he performed his "regular, pre-injury job," not "light duties" for over a year).  And like *Jankowski*, there is evidence in the record, as discussed above, that Plaintiff actually did perform her duties for years before the Hospital chose to "evaluate[] the status of all employees on long-term restrictions[.]"  Hospital Mot. 4. Accordingly, having determined that the Hospital has not satisfied its burden and that genuine issues of material fact remain, the Court need not address the remaining *McDonnell Douglas* analysis.

**B.  Plaintiff's race (Count One) and national origin (Count Three) discrimination claims will be dismissed for lack of any evidence**

The Hospital also seeks to dismiss Plaintiff's race and national origin discrimination claims.  Hospital Mot. 12-14.  Like Plaintiff's disability discrimination claims, the race and national origin discrimination claims are also analyzed under the *McDonnell Douglas* framework requiring plaintiff to first establish a *prima facie* claim of employment discrimination by a preponderance of the evidence.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). That burden may be met by establishing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that he sought to retain; (3) the plaintiff suffered an adverse employment action, *e.g.*, the termination of his employment; and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination.  *Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008); *see also Jason v. Showboat Hotel & Casino*, 329 N.J. Super. 295, 303 (App. Div. 2000) (addressing NJLAD claims under the *McDonnell Douglas* framework).  "The facts necessary to establish a *prima facie* case of discrimination under Title VII vary depending on the particular circumstances of each case." *Sarullo*, 352 F.3d at 797 n.7.

The primary dispute here centers on the fourth prong, specifically "circumstances that could give rise to an inference of intentional discrimination."  But Plaintiff herself acknowledged at her deposition that she never saw or heard anything "that suggested…that the [H]ospital's decision was made because" of her race or national origin.  Plaintiff's arguments here, which attempt to walk back her admission, are conjectural.  *See, e.g.,* Pl. Br. 13 ("[I]f the termination was partially motivated by her English skill or accent, or the culture of being an Ethiopian, it is reasonable to infer that [the Hospital's] reason was a pretext or cover-up.").

To the extent that Plaintiff argues that more discovery is necessary to establish additional facts, it is unclear what further discovery Plaintiff seeks to pursue, or what it would reveal.  *See* Pl. Br. 11 (arguing that "further discovery is needed to render a conclusion" as to whether the Hospital hiring a "white lady nurse" to fill Plaintiff's position was evidence of discrimination); *see Morgan v. Luft*, No. 9:15-CV-0024, 2016 WL 1118452, at *1 (N.D.N.Y. Mar. 22, 2016) (rejecting argument that discovery would provide "additional context to reveal a sufficiently adverse action").  In any event, nearly a year ago, Judge Edward Kiel provided the parties an opportunity to discuss any remaining discovery disputes, but Plaintiff made no mention of any outstanding discovery at that time.  D.E. 34.   Accordingly, dismissal of Plaintiff's race and national origin discrimination claims is appropriate.

## IV.    CONCLUSION

For the reasons above, the Hospital's motion for summary judgment (D.E. 37) is **DENIED in part** (Count Two) and **GRANTED in part** (Counts One and Three).  Counts One and Three are dismissed and Count Two remains.  An appropriate order accompanies this Opinion.

Dated**: December 7, 2022**

_____

Evelyn Padin, U.S.D.J.

16